Jacquelyn Reaves

PO Box 93

Pelham, North Carolina 27311

Jacquelyn.Reaves@gmail.com

(201)647-9971 (c)

*Pro Se*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JACQUELYN REAVES<br>　　　　Plaintiff,<br><br>　　-against-<br><br>MONMOUTH UNIVERSITY<br>JOANNE JODRY<br>GEORGE KAPALKA<br>GREY DIMMENA<br>NINA ANDERSON<br>CHARLENE DIANA<br>MARYANNE NAGY<br>FRANCA MANCINI<br>NEPTUNE CITY POLICE<br>KEITH MITCHELL<br>MICHAEL VOLBRECHT<br>EDWARD KIRSCHENBAUM<br>MONMOUTH UNIVERSITY POLICE<br>JEFF LAYTON<br>WILLIAM MCELRATH<br>MONMOUTH MEDICAL CENTER<br>DALE RAFINELLO;<br>ANTHONY TRACHTA;<br>AMINA CHOWDHURY;<br>MATTHEW GELLER;<br>VIRGINIA KINNEMAN;<br>JACQUELINE SOBOTI;<br>TRENTON PSYCHIATRIC HOSPITAL;<br>PATRICK ERVILUS;<br>ROBERT WOOD JOHNSON UNIVERSITY<br>HOSPITAL;<br>JAMES MCCALLUM;<br>ROBERT CAVELLA;<br>KATIE OZOLINS; | **Case Action No. 22-cv-01782**<br><br>**AMENDED COMPLAINT**<br><br>Trial By Jury Demand<br>(Medical/Professional Malpractice/<br>Criminal Misconduct) |

Plaintiff, Jacquelyn Reaves, for her Complaint against Defendants, states as follows:

## PRELIMINARY STATEMENT

1. This case arises out of the illegal and unlawful actions perpetrated by Defendants upon Plaintiff which caused several violations of Plaintiff's rights and person as well as severe extensive and irreparable damage.

2. Defendant(s) actions resulted in continual and relentless retaliation against Plaintiff contrary to State and Federal Law, public policy, and human rights, between December 2014 through 2019.

3. Plaintiff complains pursuant to Title IX, 42 U.S.C 1981, 42 U.S.C 1983, 42 U.S.C. 1985, 42 U.S.C 1988, N.J.S.A. 2C:16-1, *et. seq*, N.J.S.A. 2C:12-1, *et. seq.*, N.J.S.A. 2C-12-10, N.J.S.A 2C:33-4, and N.J.S.A 2C:30-2. Further, Plaintiff challenges the New Jersey statute of limitations for medical malpractice, N.J.S.A. 2A:14-2 (a), based on the repeated deliberate and intentional violations of her personal rights and human rights, the statute of limitations for legal malpractice, N.J.S.A 2A:14-1, based on the deliberate illegal and cruel violations of Plaintiff's civil liberties, and incurable reputational harm and damaged the malicious and intentional assaults have caused her irreparable physical and mental harm; and, she also challenges the statute of limitations based on police misconduct due to the deliberate and severe manner Plaintiff's body and rights were violated without cause by police for extended periods of time based on a concocted and phony story.  For this reason, the Court shall relax these perspective periods and value each statute on a per incident, per person, per profession/licensed professional, and properly seeks damage to redress the injuries she has suffered as a result of being harassed, assaulted, abused, victimized, and retaliated against by individuals in the legal field, the medical field, and in law enforcement solely due to her race, ethnicity, and her race, ethnicity, and gender.

## JURISDICTION AND VENUE

4. This Court has supplemental jurisdiction over this controversy pursuant to over Plaintiff's claims brought under federal law 28 USC 1331, 1337, and 1343.

5. Venue is proper pursuant to 28 USC 1391(b)1, and it is brought to the District of Camden since this is the county "any defendant resides" and "all defendants are residents of the State in which the district is located".

6. Plaintiff filed Notice of Claim with the New Jersey Department of Treasury and Risk Management in July 2016, and October 2019.

7. On May 11th, 2021, the State of New Jersey issued its Dismissal and Notice of Rights letter providing Plaintiff with her right to sue.

## THE PARTIES

8. Plaintiff, Jacquelyn Reaves (hereinafter, "Plaintiff") is an individual and resided in the State of New Jersey, in the County of Monmouth and Somerset County, during the timeframe in question.

9. Upon information and belief, Defendant Monmouth University (hereinafter, "Monmouth University") is a college licensed to do business in the State of New Jersey, with a location at 400 Cedar Avenue, West Long Branch, New Jersey 07764.

10. Upon information and belief, Defendant Joanne Jodry (hereinafter, "Jodry") is a licensed professional counselor (license#: 37PC00028400, and 37LC00117800), residing in the State of New Jersey, County of Monmouth.

11. Upon information and belief, Defendant George Kapalka (hereinafter, "Kapalka") is a licensed psychologist (license#: 35SI00283500), residing in the State of New Jersey, County of Ocean.

12. Upon information and belief, Defendant Grey Dimenna was a licensed attorney (Attorney ID 000731979), residing in the State of New Jersey, County of Monmouth.

13. Upon information and belief, Defendant Nina Anderson (hereinafter, "Anderson") is a licensed attorney in the State of Wisconsin (ID 1047005), residing in the State of New Jersey, County of Monmouth.

14. Upon information and belief, Defendant Charlene Diana is a licensed attorney (Attorney ID 015922003), residing in the State of New Jersey, County of Monmouth.

15. Defendant Mary Anne Nagy (hereinafter, "Nagy") is an individual, residing in the State of New Jersey, County of Monmouth.

16. Defendant Franca Mancini is an individual with and expired professional counselor license (37PC00222100), residing in the State of New Jersey, County of Monmouth.

17. Upon information and belief, Defendant Neptune City Police (hereinafter, "Neptune City Police") is a state policing entity, with a location at 106 West Sylvania Avenue, Neptune, New Jersey 07735.

18. Upon information and belief, Defendant Keith Mitchell (hereinafter, "Mitchell") is a police officer, residing in the State of New Jersey, County of Monmouth.

19. Upon information and belief, Defendant Michael Volbrecht (hereinafter, "Vollbrecht") is a police officer, residing in the State of New Jersey, County of Monmouth.

20. Upon information and belief, Defendant Edward Kirschenbaum (hereinafter, "Kirschenbaum") is a police officer, residing in the State of New Jersey, County of Monmouth.

21. Upon information and belief, Defendant Monmouth University Police (hereinafter, "Monmouth University Police") is a state policing entity, with a location at 400 Cedar Avenue, West Long Branch, New Jersey, 07764.

22. Upon information and belief, Defendant Jeff Layton (hereinafter, "Layton") is a police officer, residing in the State of New Jersey, County of Monmouth.

23. Upon information and belief, Defendant William McElrath (hereinafter, "McElrath") is a police officer, residing in the State of New Jersey, County of Monmouth.

24. Upon information and belief, Defendant Monmouth Medical Center (hereinafter, "Monmouth Medical"), is a medical facility licensed to do business in the State of New Jersey with a location at 300 Second Avenue, Long Branch, New Jersey 07764.

25. Upon information and belief, Defendant Dale Rafaniello (hereinafter, "Rafaniello") is a registered nurse (license#26NR06597300), residing in the State of New Jersey, County of Monmouth.

26. Upon information and belief, Defendant Anthony Trachta (hereinafter, "Trachta") is an individual with an expired licensed clinical social worker license (license #: (license#: 44SC05498000), residing in the State of New Jersey, County of Monmouth.

27. Upon information and belief, Defendant Amina Chowdhury (hereinafter, "Chowdhury" is a licensed medical doctor (license#: 25MA08179400), residing in the State of New Jersey, County of Monmouth.

28. Upon information and belief, Defendant Matthew Geller (hereinafter, "Geller") is a licensed medical doctor (license#: 25MA07191600), residing in the State of New Jersey, County of Monmouth.

29. Upon information and belief, Defendant Virginia Kinneman (hereinafter, "Kinneman") is a licensed clinical social worker (license#: 44SC05379600), residing in the State of New Jersey, County of Monmouth.

30. Upon information and belief, Defendant Jacqueline Soboti (hereinafter, "Soboti") is a licensed clinical social worker (license#: 44SC05554700), residing in the State of New Jersey.

31. Upon information and belief, Defendant Trenton Psychiatric Hospital (hereinafter, "Trenton Psych"), is a psychiatric facility licensed to do business in the State of New Jersey with a location of 101 Sullivan Way, Ewing, New Jersey 08628.

32. Upon information and belief, Defendant Patrick Ervilus (hereinafter, "Ervilus") is a registered nurse (license#: 26NO10322000), residing in the State of New Jersey, County of Camden.

33. Upon information and belief, Defendant Robert Wood Johnson University Hospital (hereinafter, "RWJ") is a medical facility licensed to do business in the state of New Jersey with a location at 110 Rehill Avenue, Somerville, New Jersey 08876.

34. Upon information and belief, Defendant Robert A. Cavella (hereinafter, "Cavella") is a licensed clinical social worker (44SC05944600), residing in the State of New Jersey, County of Somerset.

35. Upon information and belief, Defendant James McCallum (hereinafter, "McCallum") is a registered nurse (license number unknown), residing in the State of New Jersey, County of Somerset.

36. Upon information and belief, Defendant Katie Ozolins (hereinafter, "Ozolins") is a licensed clinical social worker (license#: 44SC05600400), residing in the State of New Jersey, County of Somerset.

37. Venue is proper in this Court because (1) parties are located or reside in New Jersey; and (2) the acts and circumstances upon which Plaintiff's claims are based arose and/or occurred in several counties in New Jersey Monmouth, Mercer, Union, and Somerset County.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

38. Plaintiff was a graduate student at Monmouth University on or about September 2014, located in West Long Branch, New Jersey, and she lived in off-campus housing she paid the university for.

39. Plaintiff intended to pursue her Doctoral degree after she completed her master's degree in Psychological Counseling, with an anticipated graduation date in May 2015.

40. As a graduate student, Plaintiff also worked at a local bakery to supplement her income.

41. Upon information knowledge, all Defendants and other individuals named by Plaintiff in this complaint are either Caucasian, or white, except for Defendant Anderson.

42. Upon information and knowledge, Plaintiff was the subject of this criminal activity based on her race (black or African American), color, and gender.

43. During her schooling, Plaintiff was being harassed by Defendant Jodry.

44. Defendant Jodry frequently attempted to engage Plaintiff in unnecessary and sadistic conversations with her for no reason, all of which made Plaintiff uncomfortable.

45. Defendant Jody also spoke to the class about the manner she has gotten away with criminal activity.

46. Defendant Jodry found out where Plaintiff lived and began harassing Plaintiff.

47. Plaintiff contested Defendant Jodry's harassment and bullying against her and told Jodry to "leave me alone" (sic).

48. Following Plaintiff's complaint of Defendant's Jodry's harassment against her to her advisor, Plaintiff was told she no longer mad to attend Defendant Jodry's class, and Plaintiff could submit her assignments through her advisor, Gary Handler.

49. Defendant Jodry's behavior was so distressing to Plaintiff that she filed a harassment complaint against Defendant Jodry with Defendant Anderson, and her advisor.

50. In contrast, after Plaintiff complained to Defendant Anderson, Defendant Dimenna began to harass Plaintiff.

51. Plaintiff filed a police report against Defendants Jodry, Dimenna, and Kapalka, and Monmouth university police issued an order of protection against Defendants.



52. Monmouth University police issued a protection order on behalf of Plaintiff based on her claims against Defendants Jodry, Dimenna, Kapalka, and Suzanne Fico with university police.

53. Defendant Anderson failed to pursue or investigate Plaintiff's claims, and the harassment and bullying against Plaintiff began to escalate.

54. In fact, Defendant Anderson failed to reach out to Plaintiff until after she was victimized in bias hate crimes, aggravated assaults, and criminal drugging.

55. In the email, Defendant Anderson indicated she can meet Plaintiff in person or over the phone to lodge her complaints.

## Letter to Schedule Meeting › Inbox x

 

← **Anderson, Nina** <nanderso@monmouth.edu>
to me ▾

Fri, Apr 10, 2015, 3:01 PM  ☆  ←

Dear Ms. Reaves:

This letter serves as a confirmation receipt of your letter dated March 8ᵗʰ, 2015.  As you are aware, in order to conduct a meaningful investigation, I will need to spe
with you as the individual who filed the complaint with the Office of Equity and Diversity.  Please let me know your availability to schedule a meeting which can take
place in person or via telephone.  I anticipate the meeting to last at least 45 minutes.

Regards,
Nina

Nina M. Anderson
Director
Office of Equity and Diversity
Monmouth University
West Long Branch, NJ 07764
(732) 571-7577 phone
(732) 263-5140 fax
nanderso@monmouth.edu
www.monmouth.edu

56. However, in 2019, Plaintiff received this email from Defendant Anderson.

Lastly, you may be aware that a letter banning you from Monmouth University's campus, including off campus housing or the Graduate Center, was issued by
the Monmouth University Police Department (MUPD) in 2016 which is still in effect. If you find that you need to visit any of the University campus, please
contact the MUPD in advance at (732) 571-4444.

Please let me know if you have any questions or concerns.

Thank you,
Nina

**NINA ANDERSON**
Director
Title IX Coordinator and ADA/ 504 Coordinator
Office of Equity and Diversity
o 732.571.7577 f 732.263.5140



MONMOUTH
UNIVERSITY

400 Cedar Avenue
West Long Branch, NJ 07764
monmouth.edu

57. (I digressed) Defendant Jodry became more aggressive with Plaintiff.

58. Defendant Jodry would discuss the manner her manipulative and sadistic manner of thinking has gotten her out of criminal behavior, and the manner she intended to get a student out of the university if she ever felt provoked.

59. Defendant Dimenna went into the system and repeatedly dropped all of Plaintiff's classes for the following semester, which directly impacted her financial aid and her housing.

60. Defendant Dimenna told Plaintiff these actions were deliberate, and the only manner she would be able to remain enrolled at the school for the following semester is if Plaintiff paid the school for housing and her classes in full, which was distressing to Plaintiff.

61. At that time, Plaintiff could not afford to pay the school close to $30,000 in such a short time frame, working part-time.

62. And since Defendant Dimenna represented the Office of the President of the school at that time, when Plaintiff went to the Registrar in an attempt to resolve this new issue, she was told they could not re-enroll Plaintiff in classes unless they received authorization from Defendant Dimenna.

63. Based on the circumstance, Plaintiff felt like she was being terrorized.

64. Plaintiff felt a sense of foreboding through the semester which continued through her last final exam at the end of December 2014.

65. On or about January 11th, 2015, Plaintiff received a phone call from Defendant Nagy in student services requesting for Plaintiff to meet with Nagy related to Defendant Jodry.

66. Plaintiff agreed since she thought this might resolve the criminal activity targeted towards her by members of Monmouth University.

67. In the meeting, however, Nagy yelled at Plaintiff and threatened her, her graduate education, and her housing.

68. Plaintiff felt uncomfortable with Defendant Nagy's dialog, and she left the meeting.

69. By this point in time, Plaintiff was nearing break-down.

70. On January 12th, 2015, after a harassing call from Defendant Nagy, Plaintiff reiterated that she wanted Defendant Jodry to 'leave her alone', and sent a family picture of the reason she attended graduate school in the first place.

71. Plaintiff explained the issue to Ryan Kassick in Student Housing at Monmouth University, and he granted her an extension to remain in off-campus housing until in or about January 15th, 2015.

72. Sometime in between, Defendant Kapalka called the school and changed Plaintiff's graduation from May 2015 to January 15th 2015 in the absence of Plaintiff's authorization.

---

**From:** Kapalka, George <gkapalka@monmouth.edu>
**Sent:** Sunday, December 7, 2014 2:34 PM
**To:** Jacquelyn S. Reaves; Handler, Gary
**Subject:** RE: Regarding Job Prospects..

Ms. Reaves,

We have made an agreement for you to graduate without taking Practicum, predicated upon your graduation at the end of this semester. As per the terms of this agreement, you are not authorized to take further classes at this time, and you have been removed from all courses for which you registered in the Spring semester. Please apply for graduation.

George M. Kapalka, PhD, ABPP
Professor & Chair
Department of Psychological Counseling
Monmouth University
West Long Branch, NJ 07764
732-263-5583  Fax 732-923-4681
Web site: http://bluehawk.monmouth.edu/~gkapalka/
Dept web site: http://www.monmouth.edu/school-of-humanities-social-sciences/psychological-counseling.aspx
email: gkapalka@monmouth.edu

---

73. At that time, Plaintiff only completed 27 credit hours in the Psychological Counseling department at Monmouth University, in a 30-credit hour program.

74. Although Plaintiff earned graduate credits at another university, she did not have enough time to transfer the credits to graduate in January 2015.

75. Plaintiff would also have no place to live if she graduated by January 2015.

76. Plaintiff called back the department at Monmouth University responsible for scheduling graduations and changed her graduation back to May 2015.

77. By this time, Plaintiff could not sleep, was visibly distressed, and she was on the verge of a breakdown.

78. On January 12th, 2015, Plaintiff had a breakdown and sent an email to Defendant Nagy indicating "frankly" Plaintiff knows 'all she needs to know' about Defendant Jodry through lecture.

to Mary, mjones ▾



On Mon, Jan 12, 2015 at 10:40 AM, Jacquelyn r <jacquelyn.reaves@gmail.com> wrote:
Good Morning, Mrs. Nagy, and Mrs. Jones:

Frankly, I know more about Joanne than I ever wanted to know through her lecture.

79. In tears, Plaintiff emailed a picture of Plaintiff with her niece and her dog a couple minutes a
    couple minutes later, to express (during her breakdown) that her family is the reason she was in
    graduate school in the first place.

80. Since Defendant Anderson never helped Plaintiff or addressed the issue, Plaintiff reached out to Defendant Dianna for intervention.

81. Shortly after Plaintiff scheduled an appointment to meet with Defendant Dianna, Plaintiff received an email from Defendant Dimenna indicating she must pay for her tuition and apartment in full, or otherwise vacate the premises no later than January 14th, 2015.

82. The appointment was scheduled for January 13th, 2015, at 9am.

83. In or about the first week of January 2015, Plaintiff noticed Long Branch police began to circle her apartment.

84. Plaintiff was scared and on edge since she knew something bad was going to happen to her in the absence of Defendant Anderson addressing her complaints.

85. The morning of January 13th, 2015, Plaintiff received a call from Defendant Dianna's secretary requesting from Plaintiff to attend the meeting at 3pm, instead of 9am.

86. By this time, Plaintiff was in duress.

87. When Plaintiff arrived at the meeting, she was escorted into Defendant Dianna's office by Defendant Diana's secretary, and she was alarmed to see two males sitting in long trench coats that ran towards Plaintiff after she began to slowly step back towards the door.

88. The unidentified individuals were Defendant Mitchell and Defendant Vollbrecht.

89. Defendants Mitchell and Vollbrecht violently twisted Plaintiff's arms behind her back, forcefully pushed her against a wall, handcuffed her, and dragged Plaintiff out of the back of the Wilson Hall.



90. Then Mitchell and Vollbrecht hit her head as they pushed her into a Neptune City Police car.

91. Defendant Mitchell and Vollbrecht then transported Plaintiff to Monmouth medical.

92. Plaintiff had no idea what was happening, and she was scared since she felt like she was being kidnapped.

93. Prior to this heinous incident, Defendants Mitchell and Vollbrecht illegally searched Plaintiff's apartment, and Defendant Mitchell called Long Branch police and told them to "pick her up" if they saw Plaintiff.

94. Defendant Dimenna then called Defendants Layton who called Defendant Mitchell and Vollbrecht and informed them of the meeting between Plaintiff and Defendant Diana without Plaintiff's knowledge on January 13th, 2015.

> I received a call from D/Cpl. Layton, MUPD. He advised that he received a call from Grey Dimenna advising that they were going to have Jacquelyn Reaves come in this date at 3:00pm to the General Council office to speak with her about her status with the school. He advised that if we still need to get her then we could meet her at this meeting. I advised him that this would be fine and that I would meet him at their PD at 2:30pm.

95. This was the reason Defendant Diana's secretary called Plaintiff to reschedule the meeting from 9am to 3pm in the afternoon, without Plaintiff's knowledge.

96. Upon arrival, Defendant Layton escorted Defendants Mitchell and Vollbrecht to meet with Defendants Dimenna and Diana.

> Upon our arrival D/Cpl. Layton escorted us to Wilson Hall, Office of the General Council. Upon our arrival we met with Grey Dimenna and Charlene Diana. The meeting today was scheduled with Charlene Diana. Det. Vollbrecht and I waited in Charlene Diana's office. D/Cpl. Layton waited in the main office. While

97. Upon Plaintiff's arrival, and still in the absence of speaking to Plaintiff, Defendants Mitchell and

    Vollbrecht used excessive force and slammed Plaintiff into a wall.

> pull away from me. At this time she was pushed against the wall and after a
> brief struggle she was handcuffed. Det. Vollbrecht and I completed a use of
> force report see attached. She was then led out of the back door of the office

98. Defendants told Plaintiff the reason they were assaulting her was because of Defendant Jodry.

99. Upon arrival, and at the direction of Defendant Rafainello, Defendant Vollbrecht and Monmouth

    medical security then sequestered sequestered Plaintiff in a back room, they stripped her naked,

    and strapped her to a hospital bed.

100.    Defendant Rafainello then began injecting Plaintiff with unknown drugs all of which

    Plaintiff objected to and without her authorization.

> and that she wants to leave. After several minutes of talking with her we
> assisted security and crisis unit staff with putting Jacqualyn Reaves into

> restraints. She was also given an unknown shot in the right buttocks by staff.

101.    Defendant Rafaniello continued this practice for the rest of the day and throughout the

    entire night strapped to the bed while Defendant Trachta watched.

102.    Defendant Rafinello also told Plaintiff that she can insert a catheter into Plaintiff since the

    Defendants refused her access to a bathroom.

103.    Defendant Rafinello then ordered the men to hold her down unstrap Plaintiff and redress

    Plaintiff in hospital scrubs.

104.    When Plaintiff demanded the reason why she was at Monmouth Medical from Defendant

    Trachta, Trachta indicated he is a screener, he was screening Plaintiff while she was strapped to

the hospital bed, and he received Plaintiff's information from Defendant Mancini (at Monmouth University), in the absence of Plaintiff's permission.

105.     Plaintiff was confused, scared, and she eventually passed out due to the unnecessary drugging.

106.     Plaintiff later found out that Defendant Nagy approached Defendant Jodry with the email Plaintiff sent to Defendant Nagy of Plaintiff's family picture of Plaintiff (black), her niece (who is white, and who was 4 years old in the picture), and her dog.

to Mary, mjones ▼



On Mon, Jan 12, 2015 at 10:40 AM, Jacquelyn r <jacquelyn.reaves@gmail.com> wrote:

Good Morning, Mrs. Nagy, and Mrs. Jones:

Frankly, I know more about Joanne than I ever wanted to know through her lecture.

107.      Defendant Jodry then approached Defendants Mitchell and Vollbrecht at Neptune City

Police to file a false police report against Plaintiff.

108.    Defendants Mitchell and Vollbrecht were aware of Plaintiff's complaints against

Defendant Jodry and other Defendants.

> I then contacted Grey DiMenna who is the Vice President of General Council at
> Monmouth University.  I advised him of my investigation and he advised that they
> are currently reviewing Jacquelyn Reaves status with Monmouth University due to
> the on-going allegations against both Joanne Jodry and several other teachers.

109.    Then Defendants Jodry, Mitchell, Nagy, and Vollbrecht conspired together to create a

falsified and baseless police report disregarding Plaintiff's no contract order in the absence of

arresting Defendants Dimenna, Nagy, and Jodry.

110.    Defendants Mitchell, Nagy, and Vollbrecht then asked Defendant Jodry if the picture

Plaintiff sent to Defendant Nagy was a picture of Defendant Jodry and her daughter.

111.    Defendants Vollbrecht and Mitchell then wrote in the police report that "when

(Defendant Jodry) looked at the picture she felt that there was more to the picture due to the

statement [Plaintiff] made in the email" to Defendant Nagy.

> this point, she did not feel that there was anything to worry about.  On
> 01/12/2015 she received several calls from colleagues at Monmouth University
> asking if the picture that Jacquelyn Reaves sent to the school was a picture of
> her daughter and dog.  When she looked at the picture she felt that there was
> more to this picture due to the statement she made in the e-mail.  See attached
> picture and e-mail.  In the body of the e-mail, dated 1/12/2015 at 10:40am it
> stated that she knows more about Joanne Jodry than she ever wanted to know
> through her lecture.  The complainant stated that she feels that Jacquelyn
> Reaves was making reference to the complainant's daughter, Mary Jodry by showing
> this picture along with a dog.

112.    However, Plaintiff clearly stated in the email to Defendant Nagy that Plaintiff told

Defendant Nagy that she wants Defendant Jodry to "leave me alone" (sic).

113.    Plaintiff also told Defendant Jodry directly that she wanted Jodry to "leave me alone"

(sic).



On Mon, Jan 12, 2015 at 10:40 AM, Jacquelyn r <jacquelyn.reaves@gmail.com> wrote:
Good Morning, Mrs. Nagy, and Mrs. Jones:

Frankly, I know more about Joanne than I ever wanted to know through her lecture.

I want her to leave me alone.

Jacquelyn Reaves

114.    Plaintiff was erroneously drugged at Monmouth Medical based on her family picture for

over a month and she was disallowed from signing herself out.

115.    When Defendants Geller, Kinneman, Soboti, and Chowdhury asked Plaintiff if she knew

the reason she was at Monmouth Medical, and Plaintiff tried to explain that Defendant Jodry and

other representatives were harassing her, they increased the drugs and sedatives they administered

to her against her will.

116.    When Plaintiff refused to take the drugs, the Defendants called security and nursing staff

to restrain Plaintiff, hold her down, and inject her with drugs.

117.    The more Plaintiff told Defendants Geller, Kinneman, and Soboti what really happened

the more intense and damaging the drugs became, and the longer Defendants held Plaintiff at

Monmouth Medical without cause.

118.    Defendants Kinneman and Soboti also told Plaintiff Defendant Mitchell filed a charge against Plaintiff for harassment which was alarming to Plaintiff.

119.    After Plaintiff found out about this charge, she called Neptune City police to pursue charges against Defendant Mitchell and Vollbrecht.

120.    Plaintiff spoke to lt. Quigliato who laughed at Plaintiff since she could not help from slurring her words due to the criminal drugging, he mocked her for still being at Monmouth Medical, and he hung up the phone on her.

121.    This severe sadistic criminal activity against Plaintiff based on her race, color, gender, and her family picture has lasted for over several years to cause her irreparable harm and damage.

122.    The longer Plaintiff was held at Monmouth Medical the more other staff members began to complain to Defendants Geller, Kinneman, and Chowdhury, since she did not belong there.

123.    The result of this conspired criminal activity ultimately rendered Plaintiff displaced with no income, and homeless.

124.    Some staff members at Monmouth Medical even refused to drug Plaintiff.

125.    By this time, Defendant Nagy was sending Plaintiff harassing letters to old apartment all of which were given to her by Defendants Kinneman, and Soboti at Monmouth medical, to torment Plaintiff.

126.    The letters indicated that Plaintiff is no longer a student at Monmouth University since she did not pay her tuition and housing bill, and to remove her belongings immediately.

127.    Defendant Nagy began calling Plaintiff's family member (her emergency contact) to harass her.

128.    After a month of drugging Plaintiff based on her family picture, Defendant Chowdhury told Plaintiff that she wanted a blood sample which Plaintiff refused.

129.    Shortly after, Defendants Geller, Chowdhury, Kinneman, and Soboti, ordered security to put Plaintiff in a strait jacket, they strapped her to a stretcher, and she was transported Trenton

Psychiatric Hospital, were she drugged in a similar manner for another two months under the direction of Defendant Ervilus.

130.     When Plaintiff arrived at Trenton Psych, Defendant Ervilus asked Plaintiff why she was there all of which Plaintiff did not have an answer for at that time.

131.     Defendant Ervilus then told Plaintiff that he 'can read her mind' which was strange and distressing to Plaintiff.

132.     Defendant Ervilus then issued an order to continutally drug Plaintiff.

133.     Staff at Trenton Psych questioned Plaintiff as to the reason she was there since she did not belong in the facility.

134.     They attempted to encourage Plaintiff to speak to Defendant Ervilus.

135.     However, Plaintiff knew that after Defendant Ervilus declared he could 'read her mind' that he was demented, and there was no hope.

136.     Defendant Ervilus increased the drugs and he gave her an additional 5mg of antipsychotics every other week.

137.     Plaintiff was eventually released two months later after agreeing to a subsidized housing program to be released from Trenton Psych, which forced her into Somerset County.

138.     Plaintiff felt dehumanized, she was severely depressed, cathartic, and she lost her entire support system.

139.     In August 2015, Plaintiff had to present in court in Neptune, New Jersey, to stand against false charges Defendant Mitchell and Vollbrect filed against her for something she never did.

140.     Defendants Jodry, Mitchell, and Vollbrecht were present in the courtroom to watch Plaintiff and torment her.

141.     The charges were subsequently dismissed against Plaintiff.

142.     Plaintiff's body and life felt violated which compelled her to sign criminal charges against the defendants.

143.     In September 2015, Plaintiff called Neptune City police again and spoke to Defendant

Kirschenbaum, to pursue charges against Defendants Jodry, Mitchell, and Vollbrecht.

144.     Defendant Kirschenbaum refused to conduct the investigation.

145.     By this time, Plaintiff was unable to sleep and she was plagued by intrusive nightmares.

146.     Plaintiff attempted to sign charges at Neptune City although she was concerned for her

safety.

147.     When Plaintiff presented the charge paperwork to the clerk at Neptune City Municipal

Court, the clerk went into the back room and called Defendant Vollbrecht to apprehend Plaintiff,

without Plaintiff's knowledge.

148.     Plaintiff began to feel uneasy and nervous, she asked where the bathroom was, and then

proceeded down the stairs.

149.     While Plaintiff was walking down the stairs, Defendant Vollbracht began hopping up the

stairs with a smile on his face to pass Plaintiff.

150.     Plaintiff was able to make it to her car and quickly leave town.

151.     Plaintiff then contacted Monmouth County Prosecutor's office to file charges against

Defendants.

152.     In October 2015, Plaintiff was told by Daniel Newman that he accepted Plaintiff's

complaint against Defendants Mitchell and Vollbreacht.

153.     However, when Plaintiff followed up with Newman, he told Plaintiff that the prosecutor's

office refused to investigate.

154.     Newman told Plaintiff she would have to file a complaint at the borough of Long Branch.

155.     After Plaintiff got to Long Branch Police department she told the Lieutenant staff

sergeant she wanted to pursue charges against the defendants through Long Branch Police

department.

156.     The staff sergeant cursed and told Plaintiff that Newman should have taken her

complaint.

157.     The staff sergeant left his post, told Plaintiff to sit and wait, and he went to the back of

the precinct to call Newman.

158.     Plaintiff became increasingly uncomfortable and she decided to gather her paperwork and

leave the building.

159.     When Plaintiff got in her car, she received a call from an individual that indicated he was

a detective with Long Branch Police department.

160.     The person on the phone told Plaintiff to meet him in the back of the police department

which alarmed Plaintiff.

161.     Plaintiff received a second call from the same person in an anxious and aggressive tone

this time demanding to know her location, and the make and model of her car.

162.     During the call, Plaintiff began to hear police sirens, and police cars began to speed up

and down the street whereby Plaintiff abruptly hung up the phone, and immediately left town.

163.     Later, Plaintiff found out that during Defendants Mitchell and Vollbrecht phony

investigation they also contacted Long Branch police to apprehend Plaintiff on sight.

Ryan _____ _____ _____

Branch PD respond with them to pick her up.  I contacted Long Branch PD and

advised them of what had taken place and that they may be contacted in reference

to this for transport.

164.     That evening, Plaintiff received a phone call from a family member indicating a

Sergeant from Toms River Police arrived at their home with a psychiatric screener to assault

Plaintiff again.

165.     The next day, Plaintiff called Toms River police to inquire where the call originated

from.

166.     The Sergeant from Toms River police indicated they received the call from Defendant

Kirschenbaum at Neptune City police.

167.     In 2016, Plaintiff filed a lawsuit against some of the individuals on this case related to the ongoing criminal acts against her.

168.     However, Plaintiff was still in fear, all the criminal activity against her was still influx, and she did not yet have all the background information related to the complaint.

169.     By this time, Plaintiff felt her last resort was to attempt to file charges against the defendants at the local police department in Manville, New Jersey.

170.     When Plaintiff arrived at the police department, and Plaintiff explained what had been happening, she was told she was unable to leave the police department until she received a psychiatric screen from RWJ University Hospital.

171.     By this time, Plaintiff felt nervous, exhausted, and defeated.

172.     The screener told Manville Police that Plaintiff had no choice and was forced transport to RWJ.

173.     At RWJ, security and staff attempted to force Plaintiff to take off her clothes and Plaintiff refused which agitated the staff members.

174.     Staff left Plaintiff for several hours and then attempted to inject Plaintiff with a sedative "to take the edge off" which Plaintiff also refused.

175.     After the last refusal, security came with staff to hold Plaintiff down and inject Plaintiff which an unknown drug while the Caucasian individuals in the psychiatric ward were speaking to doctors and subsequently being released.

176.     Later that afternoon, Defendant McCallum opened Plaintiff's mouth, forced drugs down her throat, pushed her into a room, and locked the door.

177.     Shortly after, Defendant McCallum opened the door with a syringe and security to hold Plaintiff down while he injected her with drugs, then locked her back into the room, in the absence of allowing Plaintiff to sign herself out.

178.     Plaintiff passed out shortly after.

179.     This practice continued at RWJ for more than a week before she was sent to Summit Oaks.

180.     Plaintiff was forced to stay at Summit Oaks for another months under ordered unnecessary drugging, before Plaintiff was transferred to Greystone Psychiatric where she stayed for another two months, drugged under similar circumstances.

181.     The staff at Summit Oaks threatened to send Plaintiff to a permanent psychiatric hospital based on the narrative in the file created against her based on her family picture.

182.     After Plaintiff was released from Greystone, Plaintiff was stalked by RWJ staff to the extent that they even came to her apartment door with Manville Police, and a "doctor's order" from Robert Flowers (license#: 25MB09446200) to remove Plaintiff from the community.

183.     They also forced Plaintiff to undergo other tests against her will which was humiliating and distressing to Plaintiff.

184.     The second time Plaintiff was forced to go to RWJ, she was committed by Defendant Cavella with the assistance of two officers from Somerville Police Department.

185.     When Plaintiff arrived to RWJ with the officers, they attempted to have her take off her clothes again which was against policy.

186.     Plaintiff refused and was told to wait in a room.

187.     A few minutes later, Defendant Cavella re-entered the room Plaintiff was in with hospital staff and security, with a syringe to assault Plaintiff.

188.     Plaintiff was able to deescalate the situation and Defendant Cavella staff, and security left the room.

189.     When Defendant Cavella walked by the room to go on break, Plaintiff said, "you know you were just about to assault me, right", Cavella responded, "yes, ma'am", and walked away.

190.     Plaintiff was held over a week at RWJ, and she was eventually sent to St. Francis psychiatry in Trenton, New Jersey for a month, and drugged accordingly.

191.   Sometime in 2017, Plaintiff was again forced transport by a person named Linda and

Defendant Ozolins (license#: 44SC05600400) by Manville Police to RWJ university hospital,

where she was again removed from the community.

192.   This time, she was assaulted by security and staff to hold Plaintiff down to involuntarily

take Plaintiff's blood.

193.   Prior to doing this, the staff ripped off Plaintiff's clothes and injected her with unknown

sedatives while being held down by security and Defendant Cavella.

194.   Plaintiff remained at RWJ for another week under the same conditions and was

eventually transported back to Greystone Psychiatric Hospital, where she remained for another

two months while being drugged with more antipsychotics.

195.   Also in 2017, Plaintiff received a letter from Defedant McElrath to threaten Plaintiff

stating he would arrest her if she ever stepped foot back on Monmouth University.

196.   Plaintiff still has not formerly graduated from the Master's program at Monmouth

University, nor has she received her diploma to date.

197.   In 2019, Plaintiff reproached Monmouth County Prosecutor's office and the office of the

Attorney General to investigate the ongoing criminal activity against her.

198.   While the prosecutor's office said they would not investigate, she did receive several

harassing phone calls from the sergeant in charge (officer Ferriera?), the actual person who had

been refusing to investigate since 2015.

199.   Elizabeth Reubman at the Office of the Attorney General eventually stopped returning

Plaintiff's calls, and Gurbir Grewal (former AG) never returned her voice messages.

200.   On May 11th, 2021, Plaintiff received a letter from the State of New Jersey instructing her

to file a "meritorious claim" in Court against the state and defendants.

201.   Plaintiff has been irreparably damaged, she has been unable to obtain or retain gainful

employment, and she has not been able to obtain therapy.

202.    However, Plaintiff was able to obtain proof from a licensed clinical social worker in

North Carolina that she still has not recovered from any of the hate crimes against her.

> her case. Jacquelyn reported she was Involuntary held  a the Monmouth Medical Center for 72 hours
> and she did not respond well to the sedative's she was administered, which caused an unexpected
> medical  and mental health disability. Jacquelyn  has not recovered from the incident and she
> continues to struggle with persistent memory intrusions that have prevented Jacquelyn from full
> recovery and able to function in her chosen profession for the last seven years.

203.    Upon information and knowledge Monmouth University's policy and law prohibits its

employees from engaging in the harassment of students, conspiring with staff and law

enforcement to commit hate crimes against the protected class, lie under oath, stalk, assault,

and/or retaliate against them for opposing, protesting, and complaining about harassment, to

purposely and deliberately humiliate, displace, and cause irreparable physical and bodily harm,

based on race, color, and gender.

204.    Upon information and knowledge, Monmouth University police's policy and law

prohibits its police officers and law enforcement officials from conspiring to engage in hate

crimes against the protected class, and facilitate unjustified acts against a victim of crime with an

order of protection, to assist in the cause of irreparable physical and bodily harm, based on race,

color, and gender.

205.    Upon information and knowledge Neptune City Police's policy and law prohibits its

police officers and law enforcement officials to conspire against citizens to deliberately falsify

police reports, and execute phony investigations against the innocent, script false charges, commit

hate crimes against the protected class, assault, and corroborate with other police and individuals

in the legal and medical/licensed community to agg. assault solely based on her race, color, and

gender.

206.      Upon information and knowledge Monmouth Medical's policy and law prohibits employees from conspiring to assault an individual, strip naked, and repeatedly and forcefully agg. assault individuals with unknown drugs for excessive periods of time in the absence of pretense, humiliate them, and damage their character based on race, color, and gender.

207.      Upon information and knowledge, Trenton Psych's policy and law prohibits employees from illegal, unlawful, and excessive drugging with or without pretense.

208.      Upon information and knowledge RWJ University hospital's policy prohibits and law prohibits employees from conspiring to physically assault an individual, rip off their clothes, threaten them, and repeatedly and forcefully assault that individual with unknown drugs for excessive periods of time in the absence of pretense, strip them from the community, humiliate them and damage their character based on race, color, and gender, for protesting aggravated assaults and harassment.

## FIRST COUNT

### Hate Crimes – Bias Intimidation (N.J.S.A. 2C:16-1 *et seq*)

209.      Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

210.      N.J.S.A 2C:16-1 states in relevant part as follows:

(a) Bias Intimidation. A person is guilty of the crime of bias intimidation if he commits, attempts to commit, conspires with another to commit, or threatens the immediate commission of an offense specified in chapters 11 through 18 of Title 2C of the New Jersey Statutes; N.J.S.2C:33-4; N.J.S.2C:39-3; N.J.S.2C:39-4 or N.J.S.2C:39-5,

(1)with a purpose to intimidate an individual or group of individuals because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity; or

(2)knowing that the conduct constituting the offense would cause an individual or group of individuals to be intimidated because of race, color, religion, gender, disability, sexual

orientation, gender identity or expression, national origin, or ethnicity; or

(3) under circumstances that caused any victim of the underlying offense to be intimidated and the victim, considering the manner in which the offense was committed, reasonably believed either that (a) the offense was committed with a purpose to intimidate the victim or any person or entity in whose welfare the victim is interested because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity, or (b) the victim or the victim's property was selected to be the target of the offense because of the victim's race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity.

(b)  Permissive inference concerning selection of targeted person or property. Proof that the target of the underlying offense was selected by the defendant, or by another acting in concert with the defendant, because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity shall give rise to a permissive inference by the trier of fact that the defendant acted with a purpose to intimidate an individual or group of individuals because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity.

(c)  Grading. Bias intimidation is a crime of the fourth degree if the underlying offense referred to in subsection a. is a disorderly persons offense or petty disorderly persons offense. Otherwise, bias intimidation is a crime one degree higher than the most serious underlying crime referred to in subsection a., except that where the underlying crime is a crime of the first degree, bias intimidation is a first-degree crime and the defendant upon conviction thereof may, notwithstanding the provisions of paragraph (1) of subsection a. of N.J.S.2C:43-6, be sentenced to an ordinary term of imprisonment between 15 years and 30 years, with a presumptive term of 20 years.

(d)  Gender exemption in sexual offense prosecutions. It shall not be a violation of subsection a. if

the underlying criminal offense is a violation of chapter 14 of Title 2C of the New Jersey Statutes and the circumstance specified in paragraph (1), (2) or (3) of subsection a. of this section is based solely upon the gender of the victim.

(e) Merger. Notwithstanding the provisions of N.J.S.2C:1-8 or any other provision of law, a conviction for bias intimidation shall not merge with a conviction of any of the underlying offenses referred to in subsection a. of this section, nor shall any conviction for such underlying offense merge with a conviction for bias intimidation. The court shall impose separate sentences upon a conviction for bias intimidation and a conviction of any underlying offense.

(h) It shall not be a defense to a prosecution for a crime under this section that the defendant was mistaken as to the race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity of the victim.

211.    Defendants committed, attempted to commit, conspired with another to commit, or threatened the immediate commission of an offense based on Plaintiff's race, and color which is illegal and unlawful under laws against bias intimidation in the State of New Jersey, and the Constitution.

212.    Plaintiff was subjected to bias intimidation based on her race (black or African American) before, and after she opposed, protests, and complained about illegal and unlawful practices orchestrated against her contrary to New Jersey State law and statue and the United States Constitution.

213.    Defendants violated the above section by criminally conspiring against Plaintiff solely to based on her race and her complaints of harassment.

214.    As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## SECOND COUNT

**Hate Crimes – False reports to law enforcement authorities (N.J.S.A. 2C:28-4 *et seq*)**

215.        Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

216.        N.J.S.A. 2C:28-4 states in relevant part as follows:

(a) Falsely incriminating another. A person who knowingly gives or causes to be given false information to any law enforcement officer with purpose to implicate another commits a crime of the fourth degree.

(b) Fictitious reports. A person commits a disorderly persons offense if he:

(1) Reports or causes to be reported to law enforcement authorities an offense or other incident within their concern knowing that it did not occur; or

(2) Pretends to furnish or causes to be furnished such authorities with information relating to an offense or incident when he knows he has no information relating to such offense or incident.

217.        Defendants colluded with law enforcement officials to create an unsubstantiated and false police report predicated on Plaintiff's race without cause to deliberately cause her harm.

218.        Defendants violated the above section by criminally conspiring against Plaintiff solely based on her race, color, and gender, and to defame her character.

219.        As a result, Plaintiff suffered extensive irreparable harm and is damaged.

### THIRD COUNT

**Hate Crimes-Aggravated Assault and Battery (N.J.S.A. 2C:12-1 *et seq*)**

220.        Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

221.        N.J.S.A. 2C:12-1 states in relevant part as follows:

(a) Simple assault. A person is guilty of assault if he:

(1) Attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or

(2) Negligently causes bodily injury to another with a deadly weapon; or

(3) Attempts by physical menace to put another in fear of imminent serious bodily injury.

Simple assault is a disorderly persons offense unless committed in a fight or scuffle entered into by

mutual consent, in which case it is a petty disorderly persons offense.

(b) Aggravated assault. A person is guilty of aggravated assault if he:

(1)Attempts to cause serious bodily injury to another, or causes such injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury; or

(2)Attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon; or

(3)Recklessly causes bodily injury to another with a deadly weapon; or

(6) Causes bodily injury to another person while fleeing or attempting to elude a law enforcement officer in violation of subsection b. of N.J.S.2C:29-2 or while operating a motor vehicle in violation of subsection c. of N.J.S.2C:20-10. Notwithstanding any other provision of law to the contrary, a person shall be strictly liable for a violation of this subsection upon proof of a violation of subsection b. of N.J.S.2C:29-2 or while operating a motor vehicle in violation of subsection c. of N.J.S.2C:20-10 which resulted in bodily injury to another person; or

(7)Attempts to cause significant bodily injury to another or causes significant bodily injury purposely or knowingly or, under circumstances manifesting extreme indifference to the value of human life recklessly causes such significant bodily injury;

Aggravated assault under subsections b. (1) and b. (6) is a crime of the second degree; under subsections b. (2), b. (7), b. (9) and b. (10) is a crime of the third degree; under subsections b. (3) and b. (4) is a crime of the fourth degree; and under subsection b. (5) is a crime of the third degree if the victim suffers bodily injury, otherwise it is a crime of the fourth degree. Aggravated assault under subsection b.(8) is a crime of the third degree if the victim suffers bodily injury; if the victim suffers significant bodily injury or serious bodily injury it is a crime of the second degree. Aggravated assault under subsection b. (11) is a crime of the third degree.

222.     Defendants subjected Plaintiff to several severe extensive aggravated assaults against her mind and physically aggressive against her body on several instances against New Jersey State law and statute and the United States Constitution, to deliberately cause her harm.

223.     Defendants violated the above section by criminally conspiring against Plaintiff solely based on her race, color, and gender.

224.     .As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## FOURTH COUNT

### Official Misconduct (N.J.S.A 2C:30-2)

225.     Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

226.     N.J.S.A 2C:30-2 states in relevant part as follows:

A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:

(a)     He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner; or

(b)     He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.

Plaintiff was subjected to severe extensive aggravated assaults against her under New Jersey law and statute, supported by the Constitution of the United States by Defendants.

227.     Defendants colluded with law enforcement officials to create an unsubstantiated and false police report predicated on Plaintiff's race without cause to deliberately cause her harm.

228.     Defendants violated the above section by criminally conspiring against Plaintiff solely based on her race, color, and/or gender, Plaintiff opposed, protested, and complained of the illegal acts and practices that were criminal and unlawful.

229.    As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## FIFTH COUNT

### Stalking (N.J.S.C 2C:12-10)

230.    Plaintiff repeats and re-alleges the foregoing allegation as if fully set forth herein.

231.    N.J.S.C 2C:12-10 states in relevant part as follows:

(a)  As used in this act:

(1)"Course of conduct" means repeatedly maintaining a visual or physical proximity to a person; directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about, a person, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or toward a person.

(2)"Repeatedly" means on two or more occasions.

(3)"Emotional distress" means significant mental suffering or distress.

(4)"Cause a reasonable person to fear" means to cause fear which a reasonable victim, similarly situated, would have under the circumstances.

(b)      A person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress.

(c)      A person is guilty of a crime of the third degree if he commits the crime of stalking in

violation of an existing court order prohibiting the behavior.

(d)      A person who commits a second or subsequent offense of stalking against the same

victim is guilty of a crime of the third degree.

232.      Plaintiff was subjected to severe and extensive stalking by Defendants against New

Jersey law and statute and the United States Constitution.

233.      As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## SIXTH COUNT

### Criminal Harassment (N.J.S.A 2C:33-4)

234.      Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

235.      N.J.S.A 2C:33-4 states in relevant part as follows:

Except as provided in subsection e., a person commits a petty disorderly persons offense if, with
purpose to harass another, he:

(a) Makes, or causes to be made, a communication or communications anonymously or at extremely
inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance
or alarm;

(b)Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

(c.) Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to
alarm or seriously annoy such other person.

236.      Defendants subjected Plaintiff to severe and extensive harassment against New Jersey

law and statue and the United States Constitution.

237.      As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## SEVENTH COUNT

### Discrimination in Violation of 42 U.S.C 1981

238.     Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

239.     42 U.S.C. 1981 states in relevant part as follows:

(a)  State of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)  "Make and enforce contracts" defined

For purposed of this section, the terms "to sue", "give evidence", "and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other", includes enjoyment of all privileges, terms, and conditions of citizenship, and applicable laws. 42 U.S.C. 1981.

240.     Defendants violated the section above by subjecting Plaintiff to relentless aggravated assaults, hate crimes, and incessant discrimination, solely based on her race (black or African American), color, and gender, and by retaliating against her for her complaints of harassment, and discrimination against New Jersey State law and statute and the United States Constitution.

241.     As a result, Plaintiff suffered extensive irreparable harm and is damage.

## EIGHTH COUNT

### 42 U.S.C. 1985

242.     Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

243.     42 U.S.C. 1985 states in relevant part as follows:

(2)  Obstructing Justice

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) Depriving Persons of Rights of Privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the

recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

244.      Defendants violated this section by conspiring against Plaintiff and through the use of force and excessive drugs deliberately deprive her of her rights and equal privileges against New Jersey State law and statute and the United States Constitution.

245.      As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## **TENTH COUNT**

### **42 U.S.C 1988**

246.      Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth hereing:

247.      42 U.S.C. 1988 states in relevant part as follows:

(a)APPLICABILITY OF STATUTORY AND COMMON LAW

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

(b) ATTORNEY'S FEES

In any action or proceeding to enforce a provision of

sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–

318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.

2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42

U.S.C. 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.],

or section 12361 of title 34, the court, in its discretion, may allow the prevailing party,

other than the United States, a reasonable attorney's fee as part of the costs, except that in

any action brought against a judicial officer for an act or omission taken in such officer's

judicial capacity such officer shall not be held liable for any costs, including attorney's

fees, unless such action was clearly in excess of such officer's jurisdiction.

(c) EXPERT FEES

In awarding an attorney's fee under subsection (b) in any action or proceeding to enforce

a provision of section 1981 or 1981a of this title, the court, in its discretion, may include

expert fees as part of the attorney's fee.

## **ELEVENTH COUNT**

### **Medical Malpractice (N.J.S.A. 2A:14-2(a)**

248.        Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein:

249.        N.J.S.A 2A:14-2, "actions for injury caused by wrongful acts", state in relevant part as

follows:

(a) Every action at law for an injury to the person caused by the wrongful act, neglect or default of

any person within this State shall be commenced within two years next after the cause of any such

action shall have accrued; except that an action by or on behalf of a minor that has accrued for medical malpractice for injuries sustained at birth shall be commenced prior to the minor's 13th birthday.

250.     Defendants deliberately violated the section above by subjecting Plaintiff to relentless aggravated assaults, relentless drugging, relentless use of force, facilitate hate crimes, solely due to her race (black or African American), color, and gender, all of which should be valued individually through each separate party involved in each separate occurrence.

251.     As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## TWELTH COUNT

### Legal Malpractice (N.J.S.A 2A:14-1)

252.     Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein:

253.     2A: 14-1 (6 years) in relevant part as follows:

Every action at law for trespass to real property, for any tortious injury to real or personal property, for taking, detaining, or converting personal property, for replevin of goods or chattels, for any tortious injury to the rights of another not stated in sections 2A:14-2 and 2A:14-3 of this Title, or for recovery upon a contractual claim or liability, express or implied, not under seal, or upon an account other than one which concerns the trade or merchandise between merchant and merchant, their factors, agents and servants, shall be commenced within 6 years next after the cause of any such action shall have accrued.

254.     Defendants deliberately violated the section above by subjecting Plaintiff to relentless aggravated assaults, relentless drugging, relentless use of force, facilitate hate crimes, solely due to her race (black or African American), color, and gender, all of which should be valued individually through each separate party involved in each separate occurrence.

255.        As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## THIRTEENTH COUNT

### Title IX (45 C.F.R. § 86.31)

256.        Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein;

257.        Title IX in relevant part as follows:

(a) *General.* Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance. This subpart does not apply to actions of a recipient in connection with admission of its students to an education program or activity of (1) a recipient to which Subpart C does not apply, or (2) an entity, not a recipient, to which Subpart C would not apply if the entity were a recipient.

(b) *Specific prohibitions.* Except as provided in this subsection, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

(5) Apply any rule concerning the domicile or residence of a student or applicant, including eligibility for in-State fees and tuition;

(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

258.     Defendants deliberately violated the section above by subjecting Plaintiff to relentless aggravated assaults, relentless drugging, relentless use of force, facilitate hate crimes, solely due to her race (black or African American), color, and gender, all of which should be valued individually through each separate party involved in each separate occurrence.

259.     As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## FOURTEENTH COUNT

### Vicarious Liability

260.     Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

261.     Defendants Monmouth University, Monmouth University police, Neptune City police, Monmouth Medical, Trenton Psych, and RWJ University hospital through its employees, Defendants Jodry, Kapalka, Nagy, Dimenna, Anderson, Diana, Layton, McElrath, Mitchell, Vollbrecht, Kirschenbaum, Mancini, Rafinello, Trachta, Geller, Kinneman, Soboti, Chowdhury, Ervilus, McCallum, Cavella, and Ozolins, conspired to commit unlawful hate crimes, and/or aided and abet to agg. assault Plaintiff.

262.     Defendants Monmouth University, Monmouth University police, Neptune City police, Monmouth Medical, Trenton Psych, and RWJ University Hospital are vicariously liable for the actions of its employees, police, lawyers, and licensed professionals and licensed individuals in the medical community.

263.     As a result, Plaintiff suffered extensive irreparable harm and is damaged.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests this Court grant the following relief:

A.  A declaratory judgment that Defendants engaged in illegal and unlawful practices prohibited Bias Intimidation (N.J.S.A. 2C:16-1 *et seq*), False reports to law enforcement authorities (N.J.S.A. 2C:28-4 *et seq*), Aggravated Assault and Battery (N.J.S.A. 2C:12-1 *et seq),* Official Misconduct (N.J.S.A 2C:30-2), Stalking (N.J.S.A. 2C: 12-10), Criminal Harassment (N.J.S.A 2C: 33-4), Discrimination in Violation of 42 U.S.C 1981, 42 U.S.C. 1985, 42 U.S.C. 1988, Medical Malpractice (N.J.S.A. 2A:14-2(a), Legal Malpractice (N.J.S.A 2A:14-) and police misconduct (7 years statute of limitation), and Title IX..

B.  An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the criminal unlawful practices, policies, and patterns set forth herein;

C.  Award damages to Plaintiff for all lost wages and benefits resulting from Defendants' for criminal and unlawful hate crimes, assaults, discrimination and retaliation, and to otherwise make her whole for any losses suffered as a result of the criminal illegal and unlawful acts orchestrated against her in the sum of $300 million dollars;

D.  Award Plaintiff compensatory damages;

E.  Award Plaintiff punitive damages;

F.  Award Plaintiff economic loss;

G.  An award of statutory penalties, and prejudgment and post judgement interests;

H.  An award of cost and expenses of this action together with Plaintiff's attorneys' and expert fees; and

I.  Such other further relief as this Court deems just and proper.

Jacquelyn Reaves, Pro Se

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated:     April 6th, 2022

Jacquelyn Reaves, Pro Se